The next case, number 221853, To-Ricos, Ltd. v. Productos Avicolas del Sur, Inc. At this time, would counsel for the appellant please introduce themselves on the record to begin? Good afternoon, I think, your honors. My name is Luis Oliver Ferticelli on behalf of the appellant, Productos Avicolas del Sur. That was pretty good, actually. That I will refer to as P-A-S or PAS, whose owner is Fernando Echeverria, who's here with us today. I'd like to reserve two minutes, please. You may. So, our position here, your honors, is that the district court committed error when it entered summary judgment in favor of To-Ricos, the appellee, because it did not evaluate the facts on record in the light most favorable to the appellant, nor did it draw all reasonable inferences in its favor. Now, because this was an entry of summary judgment, the facts are important, so I'd like to very briefly summarize some of the more salient points as relevant to the discussion today. Pollo Pico is a mark used to sell fresh chicken in Puerto Rico for over 40 years. PAS originally bought the rights to the Pico trademark in 2004 and began selling in 2005. So strong is the Pico trademark, your honors, that the top executives of its main competitor, To-Ricos, have compared it to the Coca-Cola mark and have remarked about the phenomenal job done by PAS and its predecessors in terms of branding, such that, quote, when you talk about fresh chicken in Puerto Rico, people think about Pico, not To-Ricos. I want to just jump into the issue here. So your opponent argues that the cases you point to in support of the excuse argument don't rest just on a finding of an excuse alone, that they also reference some sort of evidence of use or intent to use the mark during the relevant time period. Are there cases, can you point us to cases in which a court has found that excuse alone, sorry, excuse based just on the financial or legal challenges alone is enough? Yes, your honor. And I would dispute that characterization by Apalis, if that's the case, because the cases that discuss the excusable non-use all refer to circumstances related and excusing precisely that non-use. And in some circumstances, they also dealt, if there is in the particular unique factual scenario, other instances pointing to an intent to resume or disputing an intent not to resume, then they do discuss that. But there's case law cited in our briefs where the cases refer to, so for example, the Starkists refer to financial, unprofitable sales. The Kardec's opinion refers to financial situation, financial difficulties by the mark owner which excuse their non-use and there's no, in the Kardec's opinion in particular, there may be a little confusion because the Kardec's opinion examines two separate instances of non-use, both by the original mark owner, Sperry, and by Kardec's, the purchaser of the mark. And in the context of the Kardec's non-use, they do delve a little bit more into other circumstances that show or tend to dispute any determination of an intent not to resume. But in the case of the Sperry, the original owner, they basically recognize that the situation of their lack of sales essentially of the product were caused by financial difficulties and that there was no sales and the only thing they point to in terms of other circumstances beyond the excuse for the non-use is basically repairs done to the particular product in that scenario, not any sales or any other circumstances. You're not suggesting that good excuses for non-use are enough to establish an intent to resume use, are you? You're not suggesting that. I think the excusable non-use goes to defeat the inference of abandonment. So it doesn't, the excuse to non-use doesn't necessarily go to whether the circumstances could constitute use, rather the excusable non-use defeats any inference of abandonment, which is after all what the two-pronged analysis goes to evaluate and conclude. In other words, the non-use and the intent not to resume, they're both prongs designed to get to the conclusion or the determination as to whether there was abandonment or not. And that's what the excusable non-use does, it defeats that determination of abandonment. So, the fact that your client didn't renew with the Patent and Trademark Offices, I mean why doesn't that suggest in addition to the non-use, I mean why doesn't that support the District Court's finding of abandonment or your failure to overcome the presumption of abandonment? Well, recall that the registration on the mark is just one element, right, to determine and it's not necessarily determinative. That's why I said one and non-use. Right. So, at the time when the registrations were canceled, the only entity using the mark, selling goods under the mark in the market, was PAS. And it remained so until after the summer of 2011. And so, regardless of any registration at that time, the only rightful owner of the mark would have been, registered or not, would have been, based on their continued use since acquiring the mark, would have been only PAS. The issue doesn't arise until 2016 when its competitor, Torricos, which, you know, their executives compared to Coke and Pepsi, essentially, you know, realized that there was not a registration, a live registration. And at that point, PAS was embroiled in the litigation with its bank and realized that they were not selling products in that respect and so took the opportunity to try to register it in its name. The reality is that even though they did that, by their own admission, they did not even begin to use the mark until June 2019, more than three years after trying to register the mark in their names. Did PAS take any steps to promote the brand for future use? Or is there any evidence of a plan for a green use between that 2011 and 2016 period? So, recall that at that time, there was live, ongoing litigation where one of the things that the bank was enforcing was its lien over the mark. And so, until... Did the lien prevent its use? Yes, Your Honor. If you see the loan agreement and the lien is part of the record, but... So, while that's going on, PAS was not... The lien would have given the bank some kind of equitable ownership in the mark, but that doesn't mean that it prevented its use by your client, does it? Well, Your Honor, my reading of the lien language in the loan sale agreement, which you can see it's in the record. What language are you referring to? Say again? What language are you referring to that supports your definition? It's the language that establishes the lien. It's a paragraph within the loan sale agreement. It's part of the record. It's cited in one of the briefs. And in my reading of it, it would, and even if it didn't, any proceeds would go to the bank as a lien holder over that mark. And so it wouldn't be reasonable for any, and I think that the standard alluded to even in the cases cited by opposing counsel is whether under the particular circumstances the activities of the mark owner are those that a reasonable businessman who had a bona fide intent to use the mark would have undertaken. And I think under the circumstances in this case, the PAS took every step that a reasonable businessman could have expected to have taken, given the circumstances that it found itself in. Did you have a question? Yes, very quickly. How would, just to follow up on Judge Thompson's question, why would, even though the mark is subject to a lien, how would use of that trademark threaten the security interest? It seems to me it wouldn't at all. The lien is still in place. The lien follows the mark. Well, I didn't mean to suggest that it would threaten the lien. My suggestion would be that if and when Banco Popular allowed for that use within that litigation, any proceeds under the lien would have gone to the Banco Popular as creditor. So under those circumstances, the reasonable steps that the PAS took was, in fact, to negotiate with the bank for a discharge and a release of that lien for the return of its trademark so that it could use it outside of the litigation and outside of the lien that was then held by Banco Popular. Thank you. Thank you. Thank you, counsel. At this time, the counsel for the affilee would introduce themselves on the record to begin. Good afternoon, Your Honors. This is Attorney Sheila Torres-Delgado on behalf of Plaintiffs' Affiliate. In this case, what the appellant is requesting is for a determination that mere financial difficulties in itself is enough to excuse the lack of use of a mark, a lack of use that lasted for over five years. Although financial difficulties may lead to a lack of use, and it's understandable, it in itself is not enough. Otherwise, anyone holding a mark, all they need to do is call financial distress or financial difficulties to hold on and warehouse a mark that is not being used on the commerce. So surely something else is needed. The question is what is needed. Before delving into that, I would like to put things into perspective. We have talked, we have heard things that happened, but I think it's important to see the timeline to understand what really happened. It is uncontested that by summer of 2011, PAS stopped producing the chicken in their facilities. From 2011 to 2016, not much really happened. Two things happened. On 2012, PAS and Torrijos sat down and tried to negotiate a purchase of PAS' asset by Torrijos. That didn't happen. And by 2012, those conversations ended and PAS did not move to sell its mark anywhere else, or there is no evidence of it. The second thing that happened was... Is that negotiation in and of itself evidence of ownership and intended use? Actually, a negotiated sale is use. Torrijos understands that it doesn't because the conversations were initiated by Torrijos. They were the ones who wanted to buy the mark. However, Torrijos' position is that even if those conversations mean that they were intended, it's approved or intentioned to use, those conversations happened in 2012. And after 2012, there is no other show of intention from PAS as to try to move to sell their assets anywhere else. So even if those conversations mean an intent to use, they stop in 2012. So from 2012 to 2016, nothing happened. Well, one thing happened, and that was where I was going. The thing that happened was that they lost their corporate status before the State Department and did nothing about it until after 2016. Everything changed in 2016. In 2016, Torrijos went and filed an application before the U.S. Statutory and Trademark Office and the Puerto Rico Trademark Office. And then is when PAS started to make things or to move and execute actions to try to salvage the mark that they already abandoned. They went on and they filed an actual application before the Puerto Rico Trademark Office and the U.S. Trademark Office. And the one in the U.S. Trademark Office was suspended because they realized that no active registration by the time Torrijos filed. They went on to the Department of State and paid the dues to reinstate their corporate status that was lost a year before. So it was not until a Puerto Rico filed their application that PAS went on and reactivated their corporate status at the State Department. Then they went on and executed a license agreement. I am not going to delve into whether the license agreement was a sham agreement or not. We posit that it was. But it doesn't matter because by 2017, they had already abandoned the mark. So what is your point on timing? Was that agreement, was it 2017? September of 2017, Your Honor. Right, and so because that was outside the three-year period that established abandonment, it came too late to be even relevant to the issue of an intent to resume the use of the mark? Is that true? It's just too late? That is our position because they did so after the mark was already abandoned and Torrijos claimed the mark by filing. So is that a proposition of law that in order to establish their intent to resume, that they are limited to actions they took within that three-year period? Is that the law? It's not the law, but Your Honor, the Lanham Act requires three years of non-use in commerce. That is the time period. And then if that comes on, that three-year period is established, then the other party has to prove that they had an intent during that same period, had an intent to use, they abandoned for excusable reasons, and that they had an intent to resume using the mark after that excusable reason is no longer valid. So that has to happen during that three-year period. Otherwise, people will be allowed to warehouse marks at perpetuity without using them because what Torrijos did was they went to, after the expiration of the time, they went to and registered the mark. And the U.S. Patent and Trademark Office went on and said there is no live application or live registration for the mark. The mark is no longer in use in the commerce, and they granted the application. And when PAS went to file their own application, they say no, no, no. Torrijos has a better claim to the mark because they registered the mark after it was abandoned by PAS. So Torrijos, I mean PAS, didn't even file this suit. It was Torrijos who filed this suit because they were protecting the mark that they already registered and that was abandoned by PAS. That is, in my vision or in my opinion, very telling as to why the abandonment happened. And it's clear that PAS did nothing for five or four years. I gather it's your position that until your client made this application for the mark, I mean that then PAS panicked and said we don't do something, we're going to lose it. And that's when they began to try to establish this intent to resume. But they, according to district court, they were not able to point to any measures they had taken during that three-year period, any concrete measures they had taken in terms of business plans, strategy documents, there just wasn't anything, right? And the only thing they did was the license agreement that was done after the three-year period. Yeah. So they say that the fact that they were trying to negotiate with the bank to recover full ownership of the trademark, remove the lien, that that means that that is evidence of intent to use. Okay. I have to say two things about that. First of all, they talk a lot about the court case with Banco Popular. The first thing I have to say about that is that that case was not filed by them. It was filed by Banco Popular. And it was a, can I continue? Thank you. It was a plain collection of money suit. So the bank went after every asset of PAS, and it just happened to be that one of those assets was the PICU mark. This was not a case brought forth by PAS. And it has nothing to do with the mark. It has to do with collection of monies. And they had to defend themselves because they were sued. They were not the proponents. So what they did was to oppose to a case that was bring forth against them, and they had to defend themselves. And when they asked for the lien to be lifted, they did so after. They did so in June of 2017, if I'm not mistaking. I can tell you the exact time in a moment. But they did so also after the three-year period had expired and after the Torricos had already filed their application. So, again, this was something that was done after the time period for the June of 2017. So this was done after all of this. And they cite the court case to say that they were barred in a way of doing anything. But in this case, the facts prove something different because they did execute a license agreement, although it was outside of the three-year period. They did so while the lien was not yet been lifted. So that brings us back to whether there was anything that prohibited them from using the mark in commerce because there was none. It was proven by their own acts. Thank you. Thank you. Thank you, counsel. At this time, the appellant counsel should reintroduce himself. He has a two-minute rebuttal. Good afternoon again. Luis Oliveira Fraticeni on behalf of Appellant. Very quickly, in terms of the timing issue, Appellee's argument and the court's ruling would require you to ignore the fact that two circumstances, the litigation and the financial circumstances, were still alive until 2019 when the court finally lifted the lien and that terminated that litigation with Banco Popular. It would require you to ignore those two circumstances that we, based on the case law, understand represent excusable non-use. Second, in terms of timing as well. Appellee, go ahead. How do you rebut her last point? The licensing agreement. I was just getting to that. The timing of the licensing agreement follows the settlement agreement with Banco Popular where Banco Popular agreed finally in 2014 to release and discharge the lien over the mark so as to allow the use by PAS in exchange for the foreclosure of other assets of PAS. It was only after that settlement and after moving the court in 2017 to determine that because of Banco Popular's inaction, essentially in foreclosing and taking over the other assets negotiated in exchange for the mark, it was after that motion in 2017 to move the court, to have the court recognize that because of the bank's inaction, it should determine that the lien had been discharged, that then PAS negotiated the license agreement with IMAX. It's a different set of circumstances by that time. Unfortunately, the Commonwealth Court did not even decide the issue until November 2019. And so throughout that period of time, 2012 to 2019, the circumstances existed to excuse the non-use. If I can very briefly summarize two facts. We also have here, Your Honors, when the parties resumed negotiations, when Mr. Echegaray called Torrijos to resume negotiations towards a potential sale of the mark in 2012, there's a statement of intent that Torrijos' president admitted that Mr. Echegaray told him, look, if we can't agree on a sale, my intent is to resume use. Now, there's some case law that suggests that that kind of a statement in the context of litigation challenging claiming abandonment should not necessarily be given too much weight because, of course, that's what you're going to say if you're a defendant. But this statement goes back to 2012, not in the context of an abandonment litigation, but in the context of a negotiation towards a purchase of the asset. So it should be given weight, especially in the context of subsequent negotiations with the bank successful in 2014 to negotiate the release of the lien, which would be consistent with the intent. How does that 2012 statement help you when it's so far removed from the relevant period of abandonment? Why does that statement help you? Because the period between 2012 and 2019, when the litigation was still ongoing and the financial difficulties caused by the litigation were still ongoing, that should all be excused non-use. And because it provides the context in which this action of negotiating for getting back the lien, the inference that should have been drawn by the district court, especially in the context of the statement of intent, is that the reason to negotiate getting back the lien was precisely to make use of the mark. Instead, and in violation of the Rule 56 standard, the court decided that the inference to be drawn from that was simply that PAAs wanted to warehouse the mark or reserve the mark. That's it. Thank you. Thank you, counsel. That concludes the argument in this case.